William L. MILLER, Appellant,

v.

NORTH DAKOTA CRIME VICTIMS REPARATIONS BOARD, Appellee.

Civ. No. 890145.

Supreme Court of North Dakota.

Nov. 20, 1989.

Dyer & Summers, Bismarck, for appellant; argued by Anne E. Summers.

Hugh Patrick Seaworth (argued), Asst. Atty. Gen., North Dakota Workers Compensation Bureau, Bismarck, for appellee.

ERICKSTAD, Chief Justice.

William L. Miller appeals from a judgment of the District Court for Burleigh County, dated January 19, 1989, affirming an order of the North Dakota Crime Victims Reparations Board dated September 12, 1988, which dismissed Miller's application for benefits.[1] We affirm the judgment of the district court.

In conjunction with a softball tournament, Miller was involved in an altercation which resulted in his nose being broken and requiring surgery to correct. Miller filed an application for benefits with the North Dakota Crime Victims Reparations Board on or about October 28, 1987. On March 7, 1988, the Board dismissed the application. After a formal hearing sought by Miller, the Board on September 12, 1988, issued an order affirming the dismissal of the application. The Board's findings include the following:

"IV.

"Claimant alleges he was struck in the face by an assailant later identified as Lamont Unterseher.

"V.

"Shortly after the alleged assault, claimant was arrested by the North Dakota Highway Patrol and charged with driving while under the influence of an alcoholic beverage.

"VI.

"Following booking on the charge of DUI, claimant was interviewed by Morton County Deputy James Foley regarding the alleged assault.

"VII.

"Deputy Foley testified that after claimant initially gave him some rather sketchy information, claimant consulted with an attorney and was apparently told by the attorney that he was not to answer any additional questions. Thereafter, claimant refused to answer any additional questions or give any additional information regarding the alleged assault. Deputy Foley testified that this refusal by the claimant to provide additional information or answer additional questions interfered with his ability to investigate the allegations and pursue a criminal complaint.

"VIII.

"The Board finds, based upon Deputy Foley's testimony, that claimant did not fully cooperate with the law enforcement agency investigating the incident. Claimant's failure to answer additional questions and provide additional information to Deputy Foley interfered with Deputy Foley's investigation of the complaint and affected the ability to pursue a criminal complaint.

"IX.

"The Board finds that because of claimant's failure to fully cooperate with

1. In the Findings of Fact, Conclusions of Law, and Order for Judgment, and in the Judgment, Judge Schneider affirmed the Dismissal of the Reparations Board dated March 7, 1988. The March 7 Dismissal was the original dismissal by the Board. There was then a formal hearing and the Board issued an Order Affirming Dismissal dated September 12, 1988. We treat Judge Schneider's Order of January 19, 1989, affirming the March 7, 1988, dismissal as having intended to carry with it the affirmance of the Board's September 12, 1989, Order affirming its previous dismissal.

appropriate law enforcement agencies, the claim shall be denied."

The Board concluded:

"I.

"The claimant failed to fully cooperate with law enforcement authorities.

"II.

"The Board, upon finding that the claimant has not fully cooperated with appropriate law enforcement agencies, may deny the award of reparations.

"III.

"The claimant failed to prove that he is entitled to benefits under the North Dakota Crime Victims Reparations Act."

On appeal the District Court for Burleigh County affirmed the Board's dismissal of the application. Miller then appealed to this Court.

Miller's contentions on appeal are twofold: first, that the decision of the North Dakota Crime Victims Reparations Board was not supported by the law and by the actual weight of the evidence; and second, that the finding and conclusion of the North Dakota Crime Victims Reparations Board that appellant failed to fully cooperate with law enforcement authorities is not justified in light of the circumstances.

Section 65–13–08, N.D.C.C., provides that appeals pursuant to the Uniform Crime Victims Reparations Act will be governed by Chapter 28–32, N.D.C.C., the Administrative Agencies Practice Act.

■ Our review of administrative agency decisions is governed by section 28–32–19, N.D.C.C., and involves a three-step process: (1) Are the findings of fact supported by a preponderance of the evidence? (2) Are the conclusions of law sustained by the findings of fact? (3) Is the agency decision supported by the conclusions of law? *Falcon v. Williams County Social Service Board*, 430 N.W.2d 569, 571 (N.D.1988); *Otto v. Job Service North Dakota*, 390 N.W.2d 550 (N.D.1986); *Application of Zimbelman*, 356 N.W.2d 99 (N.D.1984).

When an administrative agency decision is appealed to the district court and then to this Court, we review the decision of the agency and not the decision of the district court. *Montana–Dakota Utilities Company v. Public Service Commission*, 413 N.W.2d 308 (N.D.1987); *Skjefte v. Job Service of North Dakota*, 392 N.W.2d 815 (N.D.1986). Accordingly, we review the record compiled before the agency rather than the findings of the district court. *Application of Zimbelman, supra.* In determining whether or not the agency's findings of fact are supported by a preponderance of the evidence, we do not make independent findings of fact or substitute our judgment for that of the agency, but determine only whether a reasoning mind could reasonably have determined that the factual conclusions were supported by the weight of the evidence. *Falcon, supra; Power Fuels Inc. v. Elkin*, 283 N.W.2d 214 (N.D.1979).

Miller was at a softball tournament on September 6, 1987, at Fort Rice, North Dakota. Miller testified that he attempted to find out the score of a game by approaching a female scorekeeper. In response to questioning, Miller testified:

"Q. Bill, back up a little bit. You walked by, and then what?

"A. Then I stopped and waited so I could get to talk to her.

"Q. Talk to who?

"A. The scorekeeper.

"Q. So that's who you wanted to talk to?

"A. Yeah.

"Q. Then what happened while you were waiting to talk to her?

"A. Well, that's when this other guy must have thought I was talking to his girlfriend or bothering her or whatever, and he told me to get away, about three times, real fast. And I looked at him and I thought, well, maybe he's joking. Then he hit me. I wasn't even looking at him.

"Q. Okay. How many times did he hit you?

"A. Three.

"Q. And where did he hit you?

"A. Nose.

"Q. Okay. do you recall talking back to him?

"A. Not that I remember. Not that I remember. I just stood there.

"Q. Did you think you were in a serious situation?

"A. No, not until he hit me. I thought it was just a joke. It wasn't.

"Q. Did you know this person?

"A. No."

The assailant, Lamont Unterseher, testified that his aunt, Joanne House, told him that someone was harassing his girlfriend. Unterseher then went over to Miller and told him to leave. In response to questions, Unterseher testified:

"Q. Did you threaten him in some way? Did you tell him, 'Either get out of here or I'll kick your butt,' words to that effect?

"A. Pretty much, yeah.

"Q. And at that point you say Mr. Miller made the comment to—

"A. To bring it on.

"Q. —bring it on?

"A. Raising his hands.

"Q. How did he raise his hands? Open like that?

"A. Just raised them, you know.

"Q. So what did you do at that point?

"A. Well, I started fighting.

"Q. When you say—

"A. I hit him is what I did.

"Q. You hit him first?

"A. Right.

"Q. Did you believe at that time that you were in any danger, or do you believe that Mr. Miller intended to assault you at that point?

"A. Well, I didn't know, you know. It's hard to say.

"Q. In other words, would you say that you hit him in self-defense, or would you say you hit him because you were upset, you wanted him to leave and he wouldn't leave, and he was harassing your girlfriend?

"A. I hit him, I'd say, in self-defense. When he raised his hands, I didn't know what he was going to do.

"Q. Did you fear that he was going to hit you at that time?

"A. Sure. You bet.

"Q. What made you think that?

"A. Raising his hands."

There was testimony that both parties had been drinking prior to the incident.

■ The Uniform Crime Victims Reparations Act allows the award of reparations pursuant to the following relevant statutes:

"*65–13–04. Award of reparations.* The board shall award reparations for economic loss arising directly from criminally injurious conduct if satisfied by a preponderance of the evidence that the requirements for reparations have been met."

"*65–13–06. Application for reparations—Awards—Limitations on awards.*

\*     \*     \*     \*     \*     \*

5. The board, upon finding that the claimant or victim has not fully cooperated with appropriate law enforcement agencies, may deny, reconsider, or reduce an award of reparations.

6. Reparations otherwise payable to a claimant shall be reduced or denied:

\*     \*     \*     \*     \*     \*

b. To the extent the board deems reasonable because of the contributory misconduct of the claimant or of a victim through which he claims."

Thus, the Board has the discretion to deny or reduce reparations to the extent it deems the victim's misconduct contributed to the injury. The Board, in its discretion, may also deny, reconsider, or reduce an award of reparations if it finds that the victim has not fully cooperated with appropriate law enforcement agencies.

■ After the incident, Miller attempted to learn the identity of his assailant. He testified that he quickly drank three beers to dull the pain and that he then left to contact the Morton County Sheriff's Department to report the incident. Upon attracting the attention of a highway patrolman, by passing him with his car, Miller

was arrested for Driving Under the Influence by Officer Robert Liebel of the North Dakota Highway Patrol. After being tested for alcohol and treated for his injury, Miller met with Deputy James Foley of the Morton County Sheriff's Department. Miller explained the incident and described the assailant. Deputy Foley testified that Miller refused to file a formal complaint for the assault charge. When asked for additional details, Miller stated that that was basically all he could remember. He indicated that he would contact the assailant and take care of the situation himself. Finally he said that he wished to contact an attorney. After contacting his attorney, Miller refused to make any further statements. Deputy Foley testified:

"Q. (MR. SEAWORTH CONTINUING) Did you feel at that point that Mr. Miller had provided sufficient information such that you could follow up and develop some leads with the hope of actually identifying the suspect?

"A. Without determining any other witnesses, I virtually had nothing to go on at that time.

"Q. Did Mr. Miller give you the names of any other witnesses that may have been present that may have had additional information?

"A. I believe he gave me the names of three of his brothers, two for sure, and I believe there was one more brother that was at the location.

"Q. Did you attempt to obtain additional information from Mr. Miller?

"A. I had asked Mr. Miller at that time if he was aware if his brothers saw the altercation take place, and he wasn't sure if they saw the actual fight. I attempted to call one of the numbers offered by Mr. Miller; however, there was no answer that evening. And it was a rather late hour by the time I called, I believe about a little after eleven.

"Q. Did the fact that Mr. Miller at one point after apparently speaking to his attorney declined to answer any additional questions about the fight or give you any additional information interfere with your ability to investigate the report?

"A. It caused a hindrance, because at that time he was reluctant—or refused to answer any more questions. I was unable to get, you know, more statements as to what actually transpired so I could provide a proper report to initiate an investigation. And he gave me the indication at that time that he was more concerned about taking care of it himself. And it was my impression, whether it was mistaken or not on my part, from his angered voice that he intended on justifying or revenging the actions on the assailant.

"Q. Other than making the—I believe you indicated two phone calls that evening to attempt to contact his brothers; is that correct?

"A. I believe I made one call myself. I don't know if Mr. Nelson—I believe he made some phone calls.

"Q. Other than that, did you do any other follow-up on that report?

"A. No, I did not, other than that evening I asked Mr. Miller if he was successful in determining and identifying the assailant if he would contact our office so we would have something to go on.

"Q. To your knowledge, did either Mr. Miller or his attorney ever contact your office with additional information?

"A. No. In fact, prior to this date, I didn't have any knowledge that the assailant was even identified. That's not saying our office didn't. I just didn't personally.

"Q. In your opinion, did Mr. Miller fully cooperate with you in the investigation of this particular incident?

"A. I feel he did not."

Miller contends that he was justified in not making any further statements due to his pending Driving Under the Influence charge and due to the fact that he was still suffering from his injury. He asserts that the circumstances entitled him to invoke his constitutional right against self-incrimination. Miller also contends that law enforcement authorities never intended to in-

vestigate or prosecute the assailant and that Miller's level of cooperation did not make any real difference to the investigation.

While it is true that Miller need not incriminate himself in the criminal proceeding,[2] if he is to benefit civilly under the provisions of Chapter 65–13, N.D.C.C., he must fully cooperate. Miller had a decision to make. He chose not to disclose any more information. Miller's criminal proceeding was concluded on December 10, 1987. Miller did not inform the Board of the identity of his assailant until February 4, 1988. Miller failed to inform Deputy Foley of the information, even though he was under a continuing request to do so. The result of Miller's actions is a denial of benefits due to a finding that he did not fully cooperate.

The language of section 65–13–06(5), N.D.C.C., is clear and unambiguous—the Board is free to deny benefits if the claimant did not fully cooperate. Words used in a statute are to be understood in their ordinary sense unless a contrary intention plainly appears. *Aanenson v. Bastien,* 438 N.W.2d 151, 153 (N.D.1989); section 1–02–02, N.D.C.C. When the wording of the statute is clear and free of all ambiguity, we have said that it is improper for the courts to attempt to construe the provisions so as to legislate additional requirements or proscriptions which the words of the provisions do not themselves provide. *Aanenson, supra;* section 1–02–05, N.D.C.C. The legislature gave the Board the discretion to deny benefits upon a finding that a claimant did not fully cooperate with appropriate law enforcement agencies.

Full cooperation is an essential feature of the statute. As others have observed from time to time, resources are finite. Because the appropriation for this purpose is extremely limited, one should not expect to share in the fund unless one has cooperated so as to make prosecution of the offender a reality. There might conceivably be circumstances which would justify something less than complete cooperation, but that is not this case. The legislature appropriated $382,560 to the Crime Victims Reparations Board for grants, benefits, and claims for the biennium beginning July 1, 1987, and ending June 30, 1989. 1987 N.D.Sess.Laws, ch. 26, § 1; 1989 N.D.Sess. Laws, ch. 55, § 1.

Miller clearly did not fully cooperate with law enforcement. Miller insinuated he would take care of the matter himself, and refused to file a formal complaint against the assailant. Miller also failed to inform Deputy Foley of the identity of the assailant, even though he had a continuing obligation to do so through Foley's request.

From our review of the record, we believe a reasoning mind could have reasonably concluded that Miller did not fully cooperate with law enforcement authorities.

■ Miller has requested in his brief that this Court award him attorney's fees on this appeal. Miller relies on section 65–13–13, N.D.C.C., which reads as follows:

"*Attorney's fees.* As part of an order, the board shall determine and award reasonable attorney's fees, commensurate with services rendered, to be paid by the state to the attorney representing the

---

2. United States Constitution, Article V, reads:
   "No person shall be held to answer for a capital or otherwise infamous crime, unless on a presentment or indictment of a grand jury, except in cases arising in the land or naval forces, or in the militia when in actual service, in time of war or public danger; nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb; *nor shall be compelled, in any criminal case, to be a witness against himself,* nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use without just compensation."

Notwithstanding our conclusion herein, legal or factual, Miller has not advanced pertinent or persuasive authority supporting his view that being required to cooperate fully in conjunction with his claim for civil benefits under Chapter 65–13, N.D.C.C., would deprive him of his Fifth Amendment right. We have said, "[o]ne who attacks a statute on constitutional grounds, . . . should bring up his heavy artillery or forego the attack entirely." *Wisdom v. State, N.D. Real Estate Com'n,* 403 N.W.2d 19, 22 (N.D.1987), citing *So. Valley Grain Dealers v. Bd. of Cty. Com'rs,* 257 N.W.2d 425, 434 (N.D.1977).

claimant. Additional attorney's fees may be awarded by a court in the event of review. Attorney's fees may be denied on a finding that the claim or appeal is frivolous. Awards of attorney's fees shall be in addition to awards of reparations and may be made whether or not reparations are awarded. It is unlawful for an attorney to contract for or receive any larger sum than the amount allowed."

The Board resists Miller's request for attorney's fees and in doing so states that the "[a]ward of attorney fees is within the discretion of the appellate court." In resisting fees, counsel for the Board points out that there is no separate appropriation for attorney's fees and that the fees must be paid out of the limited funds appropriated for compensation to victims of crime. In fact, the 1989 Legislative Assembly approved an emergency request to fund a deficiency in the 1987–1989 biennium. The Board asserts that:

> "Any attorney fees awarded will reduce the funds available for payment of awards, and necessarily result in a denial or reduction of benefits, or at least a delay in payment of benefits, to a deserving victim of crime; therefore, the Board asks that Miller's request be denied, or, if attorney fees are awarded, that such fees be limited to a nominal amount."

As Miller did not make a separate motion in this Court and support it with an affidavit as to services rendered[3], and the Board has resisted payment, we find that only nominal fees are appropriate in conjunction with this appeal. We do not find the appeal frivolous, but because of the posture of the case, we award attorney's fees only in the amount of $250.

For the reasons stated herein, the judgment of the district court affirming the judgment of the Board is affirmed. We direct the North Dakota Crime Victims Reparations Board to award attorney's fees in the amount of $250 to Miller's counsel.

GIERKE, VANDE WALLE, LEVINE and MESCHKE, JJ., concur.

---

**3.** In reference to attorney's fees this Court has said:

> "We suggest that if more than a token amount of attorney fees is sought in a request to this court to impose monetary sanctions under Rule 38, N.D.R.App.P., the request should be accompanied by an affidavit documenting the work performed on the appeal to enable us to calculate the amount of reasonable attorney fees to be assessed." *United Bank of Bismarck v. Young,* 401 N.W.2d 517, 519, n. 1 (N.D. 1987), *cert. denied,* 484 U.S. 856, 108 S.Ct. 165, 98 L.Ed.2d 119 (1987).